**AMERICAN MEDICAL SYSTEMS, INC., Plaintiff/Cross–Appellant,**

v.

**MEDICAL ENGINEERING CORPORATION, Defendant–Appellant.**

Nos. 92–1538, 92–1555.

United States Court of Appeals, Federal Circuit.

Oct. 4, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Dec. 6, 1993.

---

against Medical Engineering Corporation (MEC)[2] for willful infringement of United States Patent No. 4,597,765, issued to Klatt (the '765 patent). MEC counterclaimed for declaratory judgment of invalidity and noninfringement, for an alleged breach of warranty, and for intentional, negligent and fraudulent misrepresentation by AMS.

After a bench trial, the district court issued its Decision and Order, No. 87–C–1236(JPS),[3] on June 25, 1992, rejecting each of MEC's counterclaims and holding that the '765 patent was not invalid and was infringed. The court further found that MEC's infringement was willful and that AMS was entitled to an award of enhanced damages of 1.5 times its proven lost profits and reasonable royalties. The court limited AMS's recoverable damages to those incurred after the filing date of the lawsuit, however, due to AMS's initial failure to mark its patented articles under 35 U.S.C. § 287(a) (1988). On September 1, 1992, the district court entered judgment in accord with its decision and permanently enjoined MEC from any further infringement of the '765 patent.

Rudolf E. Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE, argued, for plaintiff/cross-appellant. With him on the brief, were George Pazuniak and R. Eric Hutz. Of counsel, was C. Thomas Sylke.

Mark T. Banner, Allegretti & Witcoff, Ltd., Chicago, IL, argued, for defendant-appellant. With him on the brief, were Jerry A. Riedinger, Grantland G. Drutchas and A. Blair Hughes.

Before NIES, Chief Judge, MICHEL and RADER, Circuit Judges.

MICHEL, Circuit Judge.

American Medical Systems, Inc. (AMS)[1] brought suit in the United States District Court for the Eastern District of Wisconsin

On appeal, MEC concedes validity and infringement, but challenges the district court's finding of willfulness and its award of enhanced damages. MEC also argues error in the denial of its counterclaim for breach of warranty and additionally alleges a violation of its Seventh Amendment right to a jury trial.[4] AMS cross-appeals the district court's limitation of its recoverable damages under 35 U.S.C. § 287(a).

Because the district court's finding of willfulness is not clearly erroneous, we affirm the court's finding on this aspect. Because no abuse of discretion has been shown, we also affirm the court's enhancement of the actual damages by 1.5 times. Finding no error, we also affirm the district court's hold-

1. AMS is a wholly-owned subsidiary of Pfizer, Inc.

2. MEC was originally an independent company, but during the course of this litigation it became a wholly-owned subsidiary of Bristol–Meyers Company (now Bristol–Meyers Squibb Corporation) in 1982.

3. The district court opinion is reported at 794 F.Supp. 1370, 26 USPQ2d 1081 (E.D.Wis.1992).

4. MEC does not appeal the district court's ruling on its misrepresentation counterclaims.

ing that there was no breach of warranty. Furthermore, we hold that MEC's alleged violation of its Seventh Amendment right to a jury trial is without merit. On AMS's cross-appeal, however, because the district court improperly construed 35 U.S.C. § 287(a) in limiting AMS's recoverable damages to those incurred after the suit was filed, we reverse and remand to the district court for a new determination of damages consistent with this decision.

## BACKGROUND

### 1. History of Competition Between AMS and MEC

AMS and MEC were vigorous competitors in the area of penile prostheses.[5] Each company had its own commercial version of a fluid-filled prosthetic device. AMS's prosthesis was called the "Hydroflex" and MEC's equivalent device was the "Flexi–Flate." Both devices were initially sold unfilled in a "dry pack" configuration.

AMS and MEC were previously involved in two interference proceedings and one arbitration concerning this prosthesis technology. All of these prior actions were settled by agreement of the parties.

One of the interference actions, Interference No. 100,779 (the '779 interference), was settled by an agreement known as the "Hakky agreement."[6] All of the counts of the '779 interference were directed solely to the prosthetic devices themselves.

The Hakky agreement contained a warranty provision which was set out in two paragraphs of the settlement agreement as follows:

17.7. AMS and MEC each represent that their respective current technical disclosures to each other are accurate and complete with respect to the patent issues in the '779 interference.

17.8. AMS and MEC each warrant that there are no other issued patents, nor any pending applications for letters patent, reissue, continuation, continuation-in-part, or divisions with respect to any device disclosed to the warranting party by the other party which would result in any infringement or other potential litigation issue.

The Hakky agreement was signed by both parties in March of 1985.[7] The disclosures made by both parties pursuant to the Hakky agreement were limited to technology involving the actual devices. At the time of this agreement, neither party discussed nor implicated matters beyond the actual devices themselves, such as the concept of pre-filling the devices during manufacture, sterilization of the devices, or packaging of the devices for implantors.

### 2. The Patent in Suit

The present appeal involves AMS's '765 patent, which claims an apparatus and method for packaging a fluid-containing penile prosthesis in a pre-filled, sterile state. The prosthesis itself comprises a hydraulic, inflatable, fluid-permeable silicone cylinder with a fluid reservoir and pump contained in the cylinder, which is self-contained such that the entire prosthesis is implanted into the penis. Both the Hydroflex and the Flexi–Flate are this type of device. The packaging comprises a sterile, fluid-filled inner package that holds the pre-filled prosthesis and a nonsterile outer package that contains the inner package in a sterile state. This packaging configuration is referred to in the industry as the "wet pack."

AMS filed its application claiming the combination of a prefilled prosthesis stored in the double layer packaging on December 27,

---

5. MEC states that it abandoned the penile prosthesis market in the summer of 1991.

6. At trial, MEC also referred to the settlement agreement from the other interference, (the Finney agreement), and the arbitration agreement between the parties. MEC's arguments on appeal do not rely on these agreements; accordingly, these agreements will not be addressed further.

7. The application for the '765 patent was pending at the time this agreement was signed by the parties. The '765 patent is unrelated to the '779 interference, other than by MEC's contentions that it was required to be disclosed pursuant to the warranty provisions of the Hakky agreement.

1984. The '765 patent issued from this application on July 1, 1986. Claims 1–12 and 21–24 of the '765 patent are directed to the apparatus comprising the prefilled and presterilized packaged prosthesis. Claims 14–15 and 18–20 of the '765 patent are directed to the method of making and sterilizing a packaged pre-filled and presterilized prosthesis.

The prior art unfilled prosthesis, such as the dry-pack Hydroflex or dry-pack Flexi–Flate, required filling in the operating room prior to implantation. This was undesirable because it increased the operating time required to implant the prosthesis and could lead to certain problems due to improper filling or leaking.

The subject matter of the '765 patent solved the problems of the prior art dry-pack configuration devices by pre-filling the prosthesis with a saline solution and immersing it in a foil pouch filled with a saline solution having the same osmotic properties as the solution within the prosthesis. This allowed the liquid level within the device to be maintained at a precise level while in storage prior to implantation. This inner foil pouch was then sterilized and stored inside an outer non-sterile container. The two layer packaging configuration allowed for a non-sterile nurse to open the non-sterile outer package and present the sterile inner package containing the pre-filled prosthesis to a sterile nurse to open in the operating field. Because of these asserted advantages, there was a much greater demand in the market for a pre-filled, pre-sterilized prosthesis over an unfilled device.

### 3. MEC's Infringement

MEC began to work on the problem of marketing a pre-filled, sterilized packaged version of its Flexi–Flate prosthesis in early 1984. MEC's original packaging concept involved placing the pre-filled prosthesis in a rigid vapor impermeable tube containing saline of the same osmolarity as that within the device. The rigid tube was then enclosed in a slightly larger tube or pouch. MEC also attempted reversing the relationship of the tube and the pouch. None of these attempts to design a pre-filled packaged prosthesis proved to be successful, however, due to problems with leaking and sterilization.

In May of 1985, MEC personnel saw AMS's pre-filled, sterilized Hydroflex prosthesis in the wet pack packaging configuration at the annual American Urological Association trade show. The AMS package at the trade show was not marked with any patent pending notice, and no representations were made at that time that any patent applications had been filed. MEC abandoned its previous packaging configurations after it obtained a sample of the Hydroflex device and packaging, which it referred to in creating its own double foil pouch wet pack packaging. MEC then introduced its own wet pack "Flexi–Flate" prosthesis in the market in May 1985. MEC also filed a patent application on its pre-filled product and package, but the application was later abandoned.

MEC became aware of the '765 patent shortly after it issued in late July 1986, through the efforts of its in-house patent counsel, Stuart Krieger.[8] AMS's patent counsel, James Elacqua, also called Krieger twice in August 1986, to advise MEC of the existence of the '765 patent. No accusation of infringement was made by AMS at that time, however. Krieger immediately contacted MEC's vice president for scientific affairs, Garry Carter, to advise him of the patent. Krieger also testified that he authorized performance of several patent validity searches on the '765 patent. These opinions were withheld at trial, however. At the end of August or the beginning of September of 1986, Krieger informed MEC's president, Robert Helbling, in an oral opinion that the '765 patent was invalid for obviousness and that MEC's wet pack Flexi–Flate fell literally within the scope of the '765 patent claims.

Shortly after learning of AMS's '765 patent, MEC began work on an alternative packaging configuration for its pre-filled device, known as the "vacuum pack." MEC did not begin selling the vacuum pack in the market until about January 1988. Even af-

---

8. Krieger was actually employed by Bristol–Meyers, of which MEC is a subsidiary. Krieger was responsible for MEC's patent matters and acted as an in-house counsel for MEC.

ter development of the vacuum pack, MEC continued to ship its remaining inventory of the wet pack Flexi–Flate throughout the remainder of 1988.

#### 4. The '765 Patent Litigation

AMS filed a complaint on October 28, 1987, accusing MEC of willful infringement of claims 1–12, 14–15, 18–20 and 21–24 of the '765 patent. The original complaint contained a jury demand and the case was docketed as a jury case. Although counsel for AMS informed counsel for MEC that the complaint had been filed, the complaint was not served at the time of filing. Settlement discussions ensued between the parties.

Meanwhile, in early November 1987, MEC contacted Mrs. Jamie Smith of Allegretti & Witcoff to conduct a validity evaluation of the patent. Smith provided an oral opinion to Krieger in December 1987 or January 1988, concluding that the '765 patent was invalid for obviousness, and that some claims were arguably anticipated. Smith put her opinion in writing, at Krieger's request, on February 24, 1988.

The settlement discussions between the parties were unsuccessful. In February 1988, AMS filed and served an amended complaint which differed from the original complaint only in that it did not contain a jury demand. MEC filed its Answer to the Amended Complaint on June 1, 1988, and later filed an Amended Answer and Counterclaims to the Amended Complaint on February 1, 1989. MEC's counterclaims included a request for declaratory judgment of invalidity and noninfringement as well as a breach of warranty claim and three counterclaims charging AMS with intentional, negligent, and fraudulent misrepresentation. The pleading did not mention a jury trial, however.

MEC's counterclaims for breach of warranty and for tortious misrepresentation were based primarily on the Hakky settlement agreement. MEC alleged that under the terms of the warranty provisions of the Hakky agreement, AMS "warrant[ed] that there [were] no other ... pending applications for letters patent ... with respect to any device disclosed to [MEC] ... which would result in any infringement or other potential litigation." [¶ 17.8 Hakky agrmt.] The Klatt application, which matured into the '765 patent, was pending during the final negotiations of the Hakky agreement. Therefore, MEC argues that AMS's failure to disclose the pending Klatt application was a breach of warranty because AMS knew that it was likely to result in litigation between the parties. MEC further alleged, in three additional counterclaims, that the "breach of warranty" resulting from AMS's nondisclosure amounted to a tortious misrepresentation.

In May of 1991, MEC moved for a jury trial relying on the jury trial demand in the original complaint. The district court denied MEC's motion on the basis that the original complaint was never served as required by Rule 38, Fed.R.Civ.P., and that therefore there had never been a proper demand for a jury trial. The court also noted that the issue of a jury trial was never raised in the pretrial conference in July of 1990. The district court concluded that the right to a jury trial had been waived.

#### 5. The District Court Decision

MEC stipulated that its Flexi–Flate prosthesis would infringe the '765 patent, if valid, but argued at trial that the '765 patent was invalid for obviousness. The district court held that the '765 patent was not invalid for obviousness and therefore, in accord with MEC's stipulation, found infringement by MEC's wet pack Flexi–Flate. The district court further found that MEC willfully infringed the '765 patent and awarded enhanced damages of 1.5 times AMS's proven lost profits and reasonable royalties.

On MEC's warranty counterclaim, the district court found that the Hakky agreement was unambiguous and required the parties to disclose only those patents and applications implicated by the limited current technical disclosures relating to the interference. Therefore, AMS was not required to disclose the '765 patent application because it did not relate to the interference. Consequently, the district court concluded that AMS did not breach any warranty in failing to disclose

the '765 patent application to MEC as part of the interference settlement agreement. Likewise, with respect to MEC's misrepresentation counterclaims, the district court found that AMS made no misrepresentation of fact in not disclosing the application leading to the '765 patent to MEC because it "was not within the scope of the interference and consequently was not required to be revealed in order to comply with the warranty." *American Medical Sys., Inc. v. Medical Eng'g Corp.*, 794 F.Supp. 1370, 1404, 26 USPQ2d 1081, 1105 (E.D.Wis.1992).

As damages, AMS asserted entitlement to lost profits for the period of July 1, 1986 (the issue date of the '765 patent), through December 1987, after which MEC's noninfringing "vacuum pack" Flexi–Flate entered the market. From January 1988 on, AMS claimed entitlement to a reasonable royalty for MEC's continued shipping of its remaining inventory of the wet pack Flexi–Flates.

In awarding damages, the district court noted that AMS did not begin to mark its Hydroflex device until two months after the patent issued and that AMS did not begin shipping those marked devices until October 15, 1986. From this, the district court concluded that more than a *de minimis* number of devices was shipped without any patent marking pursuant to 35 U.S.C. § 287(a). Accordingly, the district court held that AMS was only entitled to damages from the date that it gave MEC actual notice of infringement. The district court further found that actual notice was not given until the present lawsuit was filed on October 28, 1987. Therefore, the district court found that AMS was entitled to lost profits for the period of October 28, 1987 through December 1988, in the amount of $906,806.00, and to a reasonable royalty for the period of January 1988 to December 1988 in the amount of $46,264.24. This equals a total amount of $953,070.24 in lost profits and reasonable royalties, multiplied by 1.5, resulting in total damages of $1,429,605.30.

MEC appeals the district court's award of enhanced damages and challenges the finding of willfulness. Additionally, MEC argues that the district court erroneously construed the warranty provision of the Hakky agreement. Finally, MEC argues that the district court wrongfully denied its request for a jury trial under the Seventh Amendment.

AMS cross-appeals the district court's limitation of recoverable damages because of its initial failure to mark its patented product pursuant to 35 U.S.C. § 287(a).

## ANALYSIS

### I.

#### A. Willfulness

■ MEC argues that the district court applied the wrong legal standard in determining willfulness and, therefore, this finding should be overturned. A finding of willfulness requires the fact-finder to find that clear and convincing evidence shows "that the infringer acted in disregard of the patent ... [and] had no reasonable basis for believing it had a right to do the acts." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565, 219 USPQ 377, 378 (Fed.Cir.1983). This is a factual determination to be made after consideration of the totality of the circumstances. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1573, 9 USPQ2d 1273, 1282 (Fed.Cir.1988). In making a determination of willfulness, the court is also required to consider mitigating or ameliorating factors. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826, 23 USPQ2d 1426, 1435 (Fed.Cir.1992). We review the court's determination of willfulness under a clearly erroneous standard. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580, 24 USPQ2d 1321, 1338 (Fed.Cir.1992).

■ MEC contests the willfulness finding by relying on the district court's statement that "[b]asically, there was a lack of evidence of good faith rather than explicit evidence of bad faith." 794 F.Supp. at 1399, 26 USPQ2d at 1101. Based on this language, MEC argues that the district court applied the wrong legal standard, erroneously requiring MEC to prove "good faith" to avoid a finding of willfulness and a possible award of enhanced damages.

We reject MEC's contention that the district court applied the wrong legal standard.

The language cited and relied on by MEC that indicates that the district court considered MEC's "lack of good faith" appears in a section of the opinion discussing the district court's denial of attorney fees. Therefore, it is not conclusive of the willfulness standard applied by the district court. In any event, in the section of the opinion dealing specifically with willfulness, the district court clearly set out the correct legal standard. *Id.* at 1395, 26 USPQ2d at 1098. The context of the district court's specific discussion of willfulness clearly indicates that it applied the correct legal standard. Therefore, it is clear that MEC's argument is based solely on one passing statement taken out of context, and provides no grounds for reversal. *Lindemann Maschinenfabrik v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1406, 13 USPQ2d 1871, 1874 (Fed.Cir.1990) ("[J]udgments, not words, are appealable."); *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 718, 223 USPQ 1264, 1272 ·(Fed.Cir.1984) (this court reviews "final decisions, not passing comments").

■ Moreover, the district court considered the totality of the circumstances in reaching its determination that MEC willfully infringed the '765 patent. The district court found that MEC knew of the '765 patent shortly after it issued in July of 1986, through the efforts of its in-house patent counsel, Krieger. Krieger informed MEC that its Flexi–Flate product infringed the '765 patent. The district court also found that MEC had no reasonable good faith belief to justify its continued infringement because Krieger's oral invalidity opinion lacked credibility and because the Smith opinion, though credible, came too late to be reasonably relied upon because "[i]t was not rendered until MEC had been infringing the ['765] patent for almost twenty months." 794 F.Supp. at 1398, 26 USPQ2d at 1101. Moreover, the district court found that "[t]he [Smith] opinion was written after MEC had stopped making the wet pack, and after suit had been filed," and further, that "Mr. Helbling [MEC's president] had no knowledge of the Smith opinion in 1986–87 and testified that he relied only on Mr. Krieger's [oral] opinion." *Id.*, 794 F.Supp. at 1398, 226 USPQ2d at 1101. MEC does not challenge

these findings, which we thus have no basis to overturn as clearly erroneous. Furthermore, MEC chose to withhold all of the documentary evidence of prior searches and outside counsel opinions upon which Krieger allegedly relied in rendering his oral opinion, from which the district court properly drew a negative inference. *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1572–73, 7 USPQ2d 1606, 1611 (Fed.Cir.1988) ("Where the infringer fails to introduce an exculpatory opinion of counsel at trial, a court must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention."). Finally, the court found that MEC deliberately copied the AMS package design in developing its infringing dual pouch Flexi–Flate wet pack product. MEC has not shown these fact findings to be clearly erroneous.

Despite these findings, MEC argues that the district court erred in reaching its ultimate determination of willfulness because it allegedly ·ignored certain mitigating or ameliorating factors. According to MEC, these mitigating factors include the fact that it began designing a non-infringing alternative to the wet pack Flexi–Flate, the vacuum pack, soon after learning of the patent along with AMS's delay for an extended period of time before giving any notice of infringement to MEC. Therefore, MEC asserts that, considering these factors, the district court's determination of willfulness is clearly erroneous.

■ This argument also fails. The fact that these factors were not specifically mentioned in the district court's discussion of willfulness does not·support the conclusion that they were not considered. All of the factors raised by MEC were discussed by the district court at some point in its opinion. Furthermore, none of the factors mentioned by MEC are inconsistent with a finding of willfulness. MEC's attempt to design a non-infringing alternative does not negate MEC's continuing sales of infringing devices during the redesign period. Nor does AMS's delay in filing suit negate the fact that MEC had

actual knowledge of the '765 patent and had no reasonable basis upon which to rely in its continued infringement. Moreover, it is apparent that the district court took into account mitigating factors in determining the degree of willfulness, because it chose to award enhanced damages of only 1.5 times the total amount rather than awarding the maximum treble damages allowable under 35 U.S.C. § 284 (1988). An award of enhanced damages under section 284 is within the discretion of the district court and will not be overturned absent a clear showing of abuse of discretion. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1547–48, 221 USPQ 1, 8 (Fed.Cir.1984).

Because MEC has failed to show any legal or factual error by the district court, we uphold the court's finding of willfulness. Additionally, we affirm the district court's award of enhanced damages because MEC has failed to show that the district court abused its discretion in this matter.

### B. Breach of Warranty

On appeal, MEC also argues that the district court erred as a matter of law in construing the warranty agreement between AMS and MEC. The district court found that the warranty provision contained in paragraphs 17.7 and 17.8 of the Hakky agreement was unambiguous. The district court further found that the unambiguous language of the " 'warranty' in 17.8 requires the parties to disclose only those patents implicated by the limited 'current technical disclosures' referred to paragraph 17.7." 794

F.Supp. at 1401, 26 USPQ2d at 1103. The district court then concluded that because the '765 patent did not relate to the '779 interference, its disclosure was not required and, therefore, AMS did not breach the warranty for failing to disclose the pending application. *Id.*, 26 USPQ2d at 1103.

Contrary to its position at trial, MEC argues on appeal that the district court correctly held that the warranty provision of the Hakky agreement is unambiguous.[9] MEC also agrees with the district court that paragraphs 17.7 and 17.8 are interrelated. However, MEC argues that the unambiguous language of the agreement is broader than the district court's interpretation. MEC argues that the district court's interpretation reads additional limitations into paragraph 17.8 by concluding that any required disclosure under the warranty must have some relation to the '779 interference. According to MEC, the plain language of paragraph 17.8 required AMS to disclose *any* patent or application which may result in *any* potential litigation with respect to the disclosed Flexi-Flate device. Therefore, MEC asserts that the Klatt application should have been disclosed under the warranty, because AMS should have reasonably known that it would result in potential litigation between the parties.

State law, in this case Wisconsin law, controls in matters of contract law and interpretation. *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1241, 9 USPQ2d 1913, 1924 (Fed.Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Uni-*

9. AMS argues that MEC waived its argument on appeal that the warranty provision was unambiguous, because at trial MEC took the contrary position that the warranty provision was ambiguous. *Braun, Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 821, 24 USPQ2d 1121, 1126 (Fed.Cir. 1992) (argument that failure to introduce empirical evidence precluded finding of design patent infringement waived where issue of sufficiency of evidence was not raised before district court); *Libertyville Datsun Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 776 F.2d 735, 737 (7th Cir.1985) (argument based on amendment to agreement waived because not made at trial even where general issue of interpretation of agreement and amendment was before district court).

The cases cited by AMS are distinguishable, however, because in those cases a party attempt-

ed to present arguments that were not actually considered by the district court. In this case, however, the precise issue of whether the warranty provision was ambiguous or unambiguous was put before the district court. Furthermore, the district court did actually determine that the agreement was unambiguous and interpreted the specific language of the agreement that is relied upon by MEC in its arguments on appeal as such as a matter of law. Therefore, even though MEC argued at trial that the warranty provision was ambiguous, it is not prevented from arguing on appeal that the district court's interpretation of the unambiguous language was incorrect as a matter of law because its arguments on appeal raise nothing that was not considered by the district court.

*versal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.,* 827 F.2d 1542, 1550, 4 USPQ2d 1035, 1040 (Fed.Cir.1987). Interpretation of an unambiguous contract provision is a question of law which is subject to *de novo* review. *Lakeshore Commercial Fin. Corp. v. Drobac,* 107 Wis.2d 445, 457, 319 N.W.2d 839, 843 (1982).

■ The warranty provision of paragraph 17.8 provides that each party warrants that there are no "pending applications ... with respect to any device disclosed to the warranting party by the other party which would result in any infringement or other potential litigation issue." Looking at the plain language of these provisions, we conclude, as did the district court, that the "disclosure" referred to in paragraph 17.8 relates back to the "current technical disclosure ... with respect to the patent issues in the '779 interference" specified by paragraph 17.7. Therefore, as a matter of law, the warranty only applies to those pending applications implicated by the devices that were disclosed relating to the patent issues of the '779 interference.

To interpret the warranty provision as MEC urges, *i.e.,* that any application which could result in *any* potential litigation whatsoever with any disclosed device, reads the warranty provision out of context. The "disclosures" referred to in paragraphs 17.7 and 17.8 were made specifically with respect to the patent issues involved in the '779 interference. The district court found that the subject matter of the '765 patent did not · relate to "the patent issues in the '779 interference." 794 F.Supp. at 1401, 26 USPQ2d at 1103. MEC does not contest this finding.

Therefore, the ·'765 patent application was not required to be disclosed under paragraph 17.7. Moreover, the facts are undisputed that neither party disclosed anything relating to the prefilling, presterilizing or packaging of their respective devices which would have implicated the Klatt application, thereby requiring disclosure pursuant to paragraph 17.8. Hence, we conclude that the district court correctly determined that disclosure of the Klatt application was not required by the terms of the Hakky agreement and, consequently, that there was no breach of warranty.

## C. Jury Trial

■ MEC argues that the district court erroneously deprived it of its Seventh Amendment right to a jury trial. The district court denied MEC's pretrial motion for a jury trial, ruling that the original complaint containing the jury demand had never been served as required by Rule 38(b), Fed.R.Civ. P.[10] MEC asserts, however, that the district court made a contrary "finding" in its opinion that the original complaint had been served. In its discussion of "hard ball litigation tactics" in the "attorney fees" section of its opinion, the district court stated that "AMS filed the original complaint in this matter in October 1987, but did not *serve* it, until December 1987." 794 F.Supp. at 1399, 26 USPQ2d at 1102. Based on this one statement, MEC argues that the original complaint was served and that it never consented to withdrawal of the jury demand as required by Rule 39(a), Fed.R.Civ.P.[11] Therefore,

10. Rule 38(b) provides in relevant part:
     (b) Demand. ' Any party may demand a trial by jury ... by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party.
Also relevant is Rule 38(d) which provides in relevant part:
     (d) Waiver. The failure of a party to serve a demand as required by this rule ... constitutes a waiver by the party of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

11. Rule 39(a), Fed.R.Civ.P., provides in relevant part:
     When trial by jury has been demanded as provided in Rule 38.... [t]he trial of all issues so demanded shall be by jury, unless (1) the parties or their ·attorneys of record, by written stipulation filed. with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

MEC asks this court to vacate the district court's judgment and remand for a jury trial.

■ Once again, MEC is relying on a stray comment in the district court's opinion to try to create a basis for its argument. There is no indication in the record that the jury trial issue was before the court at trial,[12] let alone that the court's statement was intended to be a "finding" contradictory to its earlier ruling on MEC's motion that the original complaint was not served. Judge Stadtmueller's earlier finding that no jury demand had been served is supported by the record evidence. In making his ruling, the judge noted that in the Rule 16 pretrial conference occurring over a year before MEC's jury trial motion, neither party indicated that it was seeking a jury trial. Additionally, the court noted that in an earlier deposition, MEC's counsel, Mr. Banner, acknowledged that he was "not suggesting anything with regard to the matter of a jury trial." The court further noted that there was nothing in the record to establish that the original complaint had been served. The district court therefore concluded that "the matter of a jury trial was long ago waived." We repeat our earlier caution that this court reviews decisions, not statements in opinions. *Lindemann*, 895 F.2d at 1406, 13 USPQ2d at 1874. We conclude that this passing statement does not constitute a contrary "finding" by the district court.

In addition, we note that the authority relied on by MEC to establish entitlement to a jury trial, *Thomson v. Jones*, 102 F.R.D. 619 (N.D.Ill.1984), is inapposite. In *Thomson*, not only was the original complaint with the jury demand actually served on defendants, but the defendants' answer to the complaint demanded a jury trial. Here, by complete contrast, neither was the original complaint with the jury demand served nor was a jury demanded in the answer or amended answer, the latter of which was filed almost two years before the motion for a jury trial.

We conclude that MEC's argument is without merit.

## II.

### A. Patent Marking

■ AMS cross-appeals the district court's limitation of its recoverable damages to the period after the filing date of this lawsuit for failure to mark under 35 U.S.C. § 287(a),[13] claiming that the district court erroneously construed the statute. Statutory construction is a legal question which we review *de novo. Hoechst Aktiengesellschaft v. Quigg*, 917 F.2d 522, 526, 16 USPQ2d 1549, 1552 (Fed.Cir.1990).

The district court found, and the parties do not dispute the following facts. The '765 patent issued on July 1, 1986. Prior to issuance of the '765 patent, AMS had already shipped 8,556 unmarked prostheses. 794 F.Supp. at 1392, 26 USPQ2d at 1095. AMS did not begin marking its product until about two months after issuance of the '765 patent, and did not begin shipping its marked products until October 15, 1986, three and one-half months after the patent issued. *Id.*, 26 USPQ2d at 1095. During the period after issuance of the patent, 1,939 prostheses were shipped without marking. *Id.*, 26 USPQ2d at 1095. Relying on *Hazeltine Corp. v. Radio Corp. of Am.*, 20 F.Supp. 668, 35 USPQ 438 (S.D.N.Y.1937), the district court concluded that, under section 287(a), AMS was "obliged to have marked all Hydroflexes subsequent to issue [sic] of the patent, except that it is allowed a relatively small number to be

---

**12.** The record shows that MEC failed to include the jury demand issue in the Rule 16 pretrial order or to otherwise raise the issue at trial.

**13.** 35 U.S.C. § 287(a) provides:
   Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for the infringement occurring after such notice.

shipped unmarked as it readies the marking process." 794 F.Supp. at 1391, 26 USPQ2d at 1095 (citing 5 Donald S. Chisum, *Patents,* §§ 20.03[7][c][iii] n. 109 and [c][iv] & n. 133). The district court found that AMS failed to comply with section 287(a) because it had shipped more than a *de minimis* number of products after the patent issued without the requisite marking. *Id.* at 1392, 26 USPQ2d at 1095.

■ AMS argues that the district court erroneously interpreted section 287(a). Under the correct interpretation of section 287(a), AMS asserts that it is entitled to damages from the time that it began consistently marking its product, thereby satisfying the statutory requirement. According to AMS, the district court's reliance on *Hazeltine* is misplaced, because that case was decided under Revised Statute 4900, ch. 67, 44 Stat. 1058–59 (1927), the predecessor statute to the current section 287(a). R.S. 4900 provided that "[i]t shall be the *duty* of all patentees ... to give sufficient notice to the public that the same is patented ..." (emphasis added). In 1952, Congress amended R.S. 4900 to become the present section 287(a), changing the language to make marking permissive rather than mandatory, so that a "[p]atentee ... *may* give notice to the public" by the specified marking. Act of July 19, 1952, ch. 950, § 287, 66 Stat. 813. Although the legislative history does not shed much light on Congress's intent regarding this specific language change, it is clear that the amendments were meant to reorganize and clarify the prior provisions.[14] AMS argues that since *Hazeltine* and the 1952 amendments, the courts have interpreted the new marking provision to allow damages from the point at which the statute is complied with by fully marking the patented device. AMS also argues that *Hazeltine* is not applicable

to the present situation, because in that case, marking was haphazard and, therefore, the statute was never fully complied with at any time.

Specifically, AMS points to *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.,* C.A. No. 1:78–CV–1978–JOF, 1990 WL 512961 (N.D.Ga. May 29, 1990), *aff'd,* 932 F.2d 1453, 18 USPQ2d 1842 (Fed.Cir.1991). In *Slimfold,* the patentee commercialized the invention before the patent issued on May 14, 1974, but did not begin marking the patented product until November 1, 1977. *Id.,* slip op. at 16. The defendant began infringing in June 1977, the first actual notice of infringement was given in March 1978, and suit was filed in October 1978. *Id.* at 10, 16, 1. The district court held that Slimfold was entitled to damages from November 1, 1977, when it began to consistently mark its patented products. In reaching this conclusion, the court reasoned that:

> The statute does not require marking within a particular time after issuance of a patent. Both the Fifth and Sixth Circuit Courts of Appeal have so held. *Wm. Bros. Boiler & Mfg. Co. v. Gibson–Stewart Co.,* 312 F.2d 385, 386, 136 USPQ 239, 240 (6th Cir.1963); and *Bros. Inc. v. W.E. Grace Mfg. Co.,* 320 F.2d 594, 599, 138 USPQ 357, 359 (5th Cir.1963): "The Court points out that there is '... nothing in the statute requiring marking or notice within any period after issue as a condition for recovery of damages for infringement....'" Liability for infringement begins with marking (or actual notice) whenever that occurs.

*Id.* at 32–33. On appeal, the Federal Circuit specifically affirmed the district court's award of damages as of the marking date, although the specific question of the proper

---

14. The legislative history of section 287(a) is rather sparse, but the purpose of the amendments was generally described in the Senate Report as follows:
   The next few sections relate to ... [*inter alia*] marking and notice; all of which together replace present statutes on suits, with a good deal of reorganization in language to clarify the statement of the statutes.
   \* \* \* \* \* \*
   Section 287—Section Revised

Based on title 35, U.S.C., 1946 ed., § 49 (R.S. 4900, amended Feb. 7, 1927, ch. 67, 44 Stat. 1058).
   Language is changed. The proviso in the corresponding section of existing statute is omitted as being temporary in character and now obsolete.
S.Rep. No. 1979, 82nd Cong., 2d Sess. 9, 30 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2403, 2423.

interpretation of section 287(a) was not before the court. 932 F.2d at 1456, 1459, 18 USPQ2d at 1845, 1847.

As noted by the district court in *Slimfold*, both the Fifth and Sixth Circuits have in the past specifically interpreted section 287(a) to allow damages from the time that actual marking begins or from the time of actual notice of infringement, whichever comes first. In *Wm. Bros. Boiler & Manufacturing Co. v. Gibson–Stewart Co.*, 312 F.2d 385, 136 USPQ 239 (6th Cir.1963), the Sixth Circuit held that although the patentee failed to mark its patented devices for nine months after the date that the patent issued, he was entitled to recovery of damages from the time of compliance with the marking provisions of the statute. *Id.*, 136 USPQ 239. The holding was based on the district court's reasoning that

"[U]nless and until the patentee marks his patent or serves actual notice upon an alleged infringer he can recover no damages, but ... nothing in the statute require[s] marking or notice within any period after issue as a condition for recovery of damages for infringement.... [T]he penalty for failure to do either [is] limited to denial of damages for infringement at any time prior to compliance with the requirements of the statute."

*Id.* at 386, 136 USPQ at 240. In a related case, *Bros. Inc. v. W.E. Grace Manufacturing Co.*, 320 F.2d 594, 138 USPQ 357 (5th Cir.1963), the Fifth Circuit followed the same reasoning in reversing the district court's limitation of damages to the filing date of the lawsuit, allowing recovery of damages from the date of marking.

Similarly, in *Briggs v. M & J Diesel Locomotive Filter Corp.*, 228 F.Supp. 26, 63–64, 141 USPQ 96, 127 (N.D.Ill.1964), *aff'd*, 342 F.2d 573, 144 USPQ 701 (7th Cir.1965), the district court held that despite a two year delay in marking, the patentee was entitled to recover damages for infringement undertaken after marking began. Likewise, in *Mosinee Paper Corp. v. James River Corp.*, 22 USPQ2d 1657, 1662, 1992 WL 41690 (E.D.Wis.1992), the district court determined that patentee was entitled to full recovery of damages where patentee began to mark the product in 1980, prior to infringement, even though the patent in suit issued on August 21, 1979.

MEC fails to adequately distinguish these cases or to convince us that their rationale is unsound. MEC cites a number of authorities in support of the district court's interpretation of the statute that marking of all patented products must begin immediately after issuance of the patent, subject to the *de minimis* exception of *Hazeltine*.[15] These cases were all decided under the predecessor statutes to section 287(a) and, therefore, are not controlling on the interpretation of the present statute. As discussed above, since the statute was amended in 1952, the cases which specifically address this issue have interpreted section 287(a) to allow damages from the time when marking begins in compliance with the statute or actual notice is given, whichever comes first.[16]

---

**15.** MEC cites numerous cases standing for the proposition that *all* patented articles must be marked after issuance of the patent. *The Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 801, 19 L.Ed. 566 (1869) (decided under the marking statute of 1861, Act of March 2, 1861, ch. LXXXVIII § 13, 12 Stat. 249 (1863)); *Crier v. Innes*, 170 F. 324, 326 (2d Cir.1909) (decided under R.S. 4900, U.S.Comp.Stat.1901, p. 3388); *Gordon v. Easy Washing Mach. Corp.*, 39 F.Supp. 202, 203, 49 USPQ 321, 322 (N.D.N.Y.1941) (decided under R.S. 4900, ch. 67, 44 Stat. 1058–59 (1927)); *Kilgore Mfg. Co. v. Triumph Explosives, Inc.*, 37 F.Supp. 766, 775, 49 USPQ 51, 53 (D.Md.1941) (decided under R.S. 4900); *Matthews & Willard Mfg. v. National Brass & Iron Works*, 71 F. 518 (E.D.Pa.1895) (decided under the marking statute of 1870, Act of July 8, 1870, ch. CCXXX § 38, 16 Stat. 203 (1871)). All of these statutes under which MEC's authorities were decided imposed a *duty* to mark on the patentee.

**16.** Although other cases appear to be contradictory, they do not address the specific factual situation presented here. For example, *General Electric Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 726, 134 USPQ 55, 57 (6th Cir.1962), has been cited for the proposition that *all* patented products must be marked. All that *General Electric* says, however, is that "[i]n view of General Electric's failure to mark its products as required by statute, or to give any notice of infringement, it could not, in any event, recover damages for infringements occurring prior to the filing of the action for infringement." (citations omitted). This case clearly does not address the situation where marking was fully complied with at some date after issuance. *See also Maxwell v. Baker*, 805 F.Supp. 728, 26 USPQ2d 1241 (D.Minn.

Although not binding on this court, we find the reasoning of the post–1952 cases highly persuasive. The plain language of section 287(a) does not provide any time limit by which marking must begin, nor does the legislative history indicate any such limitation.[17] Congress structured the statute so as to tie failure to mark with disability to collect damages, not failure to mark *at the time of issuance* with disability to collect damages. Furthermore, allowing recovery of damages from the point of full compliance with the marking statute furthers the policy of encouraging marking to provide notice to the public, even if initial marking after issuance of the patent is delayed. The sooner one complies with the marking requirements, the more likely one is to maximize the period of time for recoverable damages. To prevent recovery of damages for failure to immediately mark, however, provides no incentive for a patentee who inadvertently or unavoidably fails to mark initially to mark in the future.

Moreover, preventing recovery of damages for an initial failure to mark does not remedy the problem of having unmarked products in the marketplace. Any products entering the market prior to issuance of the patent will not be marked. Even the *Hazeltine* court recognized that "[i]t is not the number of articles seen by the defendant which is controlling on an issue of marking ... but whether the patentee performed this statutory duty which was a prerequisite to his *in rem* notice to the world." *Hazeltine*, 20 F.Supp. at 671, 35 USPQ at 442. Therefore, once marking has begun in compliance with the statute, *in rem* notice is provided and there is no reason to further limit damages on this account.

In light of the permissive wording of the present statute, and the policy of encouraging notice by marking, we construe section 287(a) to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute. Therefore, a delay between issuance of the patent and compliance with the marking provisions of section 287(a) will not prevent recovery of damages after the date that marking has begun. We caution, however, that once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute.

■■■■ Applying this statutory construction to the facts of this case, AMS is entitled to damages from the time when it either began marking its products in compliance with section 287(a) or when it actually notified MEC of its infringement, whichever was earlier. AMS began marking its products about two months after issuance of the '765 patent and it began externally shipping those marked products on October 15, 1986. The district court found that actual notice of infringement was not given until the lawsuit was filed on October 28, 1987. AMS has not shown that the district court's finding as to actual notice was clearly erroneous.[18]

■■■ We hold that AMS is entitled to damages from the time that it began shipping its marked products, October 15, 1986, rather than the filing date of the lawsuit as found by the district court, because AMS was in compliance with the marking statute at that time. The date that AMS began marking its products is irrelevant for purposes of

1992) (fact issue existed as to licensees failure to mark patented products); *In re Yarn Processing Patent Validity Litig.*, 602 F.Supp. 159, 168, 225 USPQ 765, 771 (W.D.N.C.1984) (licensees of patent failed to mark products); *Miller v. Daybrook–Ottawa Corp.*, 291 F.Supp. 896, 158 USPQ 635 (N.D.Ohio 1968) (inconsistent marking by patentee).

**17.** The legislative history cited by MEC referring to the requirement to mark *all* or *each* patented article is not responsive to the question of whether Congress intended to deny damages even after the patentee begins to mark all patented articles.

**18.** AMS argues that MEC was notified in August 1986 by its own counsel, Krieger, that MEC was infringing the '765 patent. This is clearly not what was intended by the marking statute. Section 287(a) requires a party asserting infringement to either provide constructive notice (through marking) or actual notice in order to avail itself of damages. The notice of infringement must therefore come from the patentee, not the infringer. *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1066, 3 USPQ2d 1288, 1292 (Fed.Cir.1987) ("Absent notice, [infringer's] 'knowledge of the patents' is irrelevant.").

the statute, because marking alone without distribution provides no notice to the public where unmarked products are continuing to be shipped. The purpose of the constructive notice provision is "to give patentees the proper incentive to mark their products and thus place the world on notice of the existence of the patent." *Laitram Corp. v. Hewlett–Packard Co.*, 806 F.Supp. 1294, 1296, 25 USPQ2d 1827, 1834–35 (E.D.La.1992). The world cannot be "put on notice" if the patentee marks certain products, but continues to ship unmarked products. Therefore, AMS was not in full compliance with the marking statute while it continued to ship its unmarked products, which continued to mislead the public into thinking that the product was freely available. Full compliance was not achieved until AMS consistently marked substantially all of its patented products, and it was no longer distributing unmarked products. We therefore remand this portion of the case to the district court for a proper determination of damages consistent with this decision.

### B. Patent Marking Relating to Method Claims

■ AMS argues that the district court erred in limiting its recoverable damages from the infringed method claims of the '765 patent pursuant to section 287(a). The law is clear that the notice provisions of section 287 do not apply where the patent is directed to a process or method. *Bandag, Inc. v. Gerrard Tire Co., Inc.*, 704 F.2d 1578, 1581, 217 USPQ 977, 979 (Fed.Cir.1983) (citing *Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 56 S.Ct. 528, 80 L.Ed. 736 (1936)); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1083, 219 USPQ 679, 685 (Fed.Cir.1983) (noting that section 287(a) does not apply where only method claims are infringed). The district court, however, relied on *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 3 USPQ2d 1288 (Fed.Cir. 1987), in holding that "where there are both product and method claims being claimed infringed, the patentee must mark the product." 794 F.Supp. at 1391, 26 USPQ2d at 1095.

■ In *Devices for Medicine*, the court noted that in *Bandag* and *Hanson*, a distinction was made between cases "in which only method claims are asserted to have been infringed" and cases where a patentee alleges infringement of both the apparatus and method claims of the same patent. *Devices for Medicine*, 822 F.2d at 1066, 3 USPQ2d at 1292. The *Devices for Medicine* court further stated that because the method claims of the patent were directed to the use of the claimed product, "[h]aving sold the product unmarked, [the patentee] could hardly maintain entitlement to damages for its use by a purchaser uninformed that such use would violate [patentee's] method patent." *Id.*, 3 USPQ2d at 1292.

AMS contends that *Devices for Medicine* is inapposite, because in that case the patent contained product claims and claims covering the use of the same product. AMS asserts that the sale of a product carries an implied license to use it as a matter of law; therefore failing to mark a patented product rationally creates an expectation of receiving a right from the seller to use it for its customary purposes. By contrast, AMS argues that the '765 patent involves methods of making and sterilizing the patented product and that sale of a product does not grant any implied license to make an additional product or to use a particular manufacturing process to make it. Therefore, AMS asserts that the rationale of *Devices for Medicine* should not apply and that section 287(a) has no application to the instant method claims.

■ We find AMS's distinction of the claims in *Devices for Medicine* from those in the present action to be meaningless within the context of section 287(a). The purpose behind the marking statute is to encourage the patentee to give notice to the public of the patent. The reason that the marking statute does not apply to method claims is that, ordinarily, where the patent claims are directed to only a method or process there is nothing to mark. Where the patent contains both apparatus and method claims, however, to the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do

so if it intends to avail itself of the constructive notice provisions of section 287(a).

In this case, both apparatus and method claims of the '765 patent were asserted and there was a physical device produced by the claimed method that was capable of being marked. Therefore, we conclude that AMS was required to mark its product pursuant to section 287(a) in order to recover damages under its method claims prior to actual or constructive notice being given to MEC.

### C. Attorney Fees

We deny AMS's request for attorney fees based on its allegation that MEC's jury trial argument was so frivolous and unreasonable as to warrant sanctions. Although we found MEC's arguments on this issue to be meritless, this was but one issue in an appeal which otherwise was not frivolous. Moreover, meritlessness does not prove frivolity. "Even though an appeal is judged 'entirely without merit,' ... it may have presented an arguable basis for reversal, and thus not qualify for sanctions." *Biodex Corp. v. Loredan Biomedical Inc.*, 946 F.2d 850, 863–64, 20 USPQ2d 1252, 1263 (Fed.Cir.1991) (citation omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992). Therefore we deny AMS's request for sanctions.

### CONCLUSION

*AFFIRMED–IN–PART, REVERSED–IN–PART and REMANDED.*

### COSTS

Each party shall bear its own costs.