Susan M. MAXWELL, Plaintiff,

v.

K MART CORPORATION, Melville Corporation, Morse Shoe, Inc. and Shopko Stores, Inc. Defendants.

Civ. No. 4–93–525.

United States District Court,
D. Minnesota,
Fourth Division.

March 31, 1995.

Earl D. Reiland, Daniel W. McDonald, Alan G. Gorman, and Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, MN, for plaintiff.

James J. Foster, and Wolf, Greenfield & Sacks, P.C., Boston, MA, and Bruce H. Little, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, for defendant Morse Shoe Inc.

Alan L. Unikel, Timothy L. Swabb, Robert J. McMurtry, and Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, and David R. Fairbairn, Thomas O. Stueber, Joseph R. Kelly, and Kinney & Lange, Minneapolis, MN, for defendant Melville Corp.

## ORDER

DOTY, District Judge.

This matter is before the court on defendant Melville Corporation's motion for summary judgment and cross-motions for partial summary judgment brought by Melville and defendant Morse Shoe, Inc. and plaintiff Susan M. Maxwell. Based on a review of the file, record and proceedings herein, and for the reasons stated below, Melville's motion for summary judgment and partial summary judgment is denied, Morse's motion for partial summary judgment is denied and Maxwell's motion for partial summary judgment is granted in part and denied in part.

## BACKGROUND

This case concerns various systems used to connect shoes which do not have laceholes, buckles or other apertures through which a filament can be threaded to join the shoes. Maxwell is the owner of record and named inventor of United States Patent No. 4,624,-060 ('060 patent). The patent claims a "system for connecting mated pairs of shoes to prevent separation and possible mismatching when offered for sale in self-service stores." '060 patent, abstract. Maxwell filed a patent application on October 6, 1983, and a patent was issued on November 25, 1986. The '060 patent expressly claims a system that threads a filament through loops or fastening tabs secured between the inner and outer soles of each shoe of a mated pair. Maxwell's shoe connection system securely joins mated shoes together without damaging the shoes. The loops used to attach the shoes are not visible when the shoes are worn and do not irritate the wearer.[1]

Before 1983, discount stores connected shoes without apertures by punching holes in each shoe and passing a filament through the holes. The method was not ideal, however, because it left a permanent blemish on the shoes. Maxwell was a buyer of children's shoes for Target Stores in 1982. In early 1983, Maxwell's supervisor told her and another shoe buyer to find an alternative to the awling system. Maxwell described how she conceived of the claimed invention in the spring of 1983. Maxwell had exercised outside and was resting on her living room floor. From that vantage, Maxwell could see tags affixed to the bottom of two chairs. Maxwell realized that she could attach the chairs by punching a hole in each tag and running a string through them.

Maxwell thought that if a similar tab was secured inside a shoe she could use the same system to join shoes without damaging them. Maxwell considered fastening the tab be-

---

1. The claims of the '060 patent were discussed in detail in the court's earlier order concerning infringement. *See Maxwell v. K Mart Corp.,* 844 F.Supp. 1360 (D.Minn.1994). That discussion need not be repeated here.

tween the inner and outer soles and stitching it to the shoe upper. Maxwell claims she used shoes, strips of paper and string to test out her idea. A few days later Maxwell shared her idea with her neighbors including Susan Tigner. Tigner, however, recalled that Maxwell first told her of the idea in the winter of 1983. In the summer of 1983, Maxwell or another Target buyer asked Richard Shapiro of Regent Shoe to make a sample or prototype of the system. The system performed extremely well and resolved the problems of awling.

Maxwell granted Target Stores a non-exclusive license to use the tab connection system on shoes purchased for resale. Once Target began using Maxwell's shoe connection system, other discount retailers, including the defendants, followed suit. Defendant Morse sells shoes through large discount retail stores, such as Fayva. Defendant Melville sells shoes through its divisions Thom McAn and Meldisco. Thom McAn sells shoes in its own stores; Meldisco has a license with K mart Corporation to operate the shoe departments in all K mart stores. In 1990, Maxwell tried but failed to negotiate a license with Morse and Melville. Defendants then developed and currently use alternative shoe connection systems which secure the loop or fastening tab in a different location within the shoe.

The accused devices are several types of shoe connection systems currently used by defendants Morse and Melville. For shoes that do not have a suitable aperture but do have a counter pocket, Morse and Melville use a connection system in which a loop or fastening tab is sewn to the counter pocket of the shoe. For shoes that have neither an aperture or counter pocket, Morse employs a system in which the loops are attached inside the shoe upper at the top line of the shoes. The top line system may be used for lined or unlined shoes. Morse and Melville use the same system in boots without a vertical seam. To join boots that have a vertical seam and a boot strap, Morse and Melville secure the loop two inches below the top line under the vertical seam.

Maxwell filed suit on November 24, 1992, alleging that defendants Morse and Melville,

as well as others, sold shoes using attachment systems that violated the '060 patent. Defendants moved for summary judgment arguing that their current shoe connection systems do not infringe the '060 patent. The court held that the accused shoe connection systems do not literally infringe the '060 patent but that material fact issues exist concerning Maxwell's claim of infringement under the doctrine of equivalents. *Maxwell v. K Mart Corp.*, 844 F.Supp. 1360 (D.Minn. 1994). Morse and Melville now seek summary judgment on the issues of patent invalidity, notice and compliance with the marking requirements of 35 U.S.C. § 287(a). Maxwell responds that issues of fact preclude summary judgment on the issues of marking and notice and that summary judgment should be entered in her favor on the issue of patent validity. Maxwell also seeks summary judgment concerning the amount of Morse's infringing sales and the bankruptcy bar defense asserted by Morse.

## DISCUSSION

■ The court applies the same summary judgment standard to motions involving patent claims as it does to motions involving other types of claims. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988) ("It is no longer debatable that the issues in a patent case are subject to summary judgment."); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984) ("[T]he statutory purposes of the grant of summary judgment under Fed.R.Civ.P. 56 are without question intended to be effectuated in patent litigation as in any other type of suit and in accordance with the same standard.") (footnote omitted).

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as

a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

On a motion for summary judgment, the court views the evidence in favor of the non-moving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## 1. Patent Validity

Defendants contend that the '060 patent is invalid under 35 U.S.C. § 102(f) because Maxwell derived the claimed invention from another. The priority of Maxwell's claimed invention under 35 U.S.C. § 102(g) is challenged by Morse. Sections 102(f) and (g) provide, respectively, that a patent is not available if the patentee did not herself invent the subject matter or if the invention was first made by another in this country who had not abandoned, suppressed or concealed it. Melville also asserts that the '060 patent is invalid under 35 U.S.C. § 112 because the claim language contains a false statement.

■ All patents are presumed valid. 35 U.S.C. § 282. A patent being presumed val-

id, a patentee need submit no evidence in support of a conclusion of validity. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir.1986). The party asserting invalidity must overcome the statutory presumption by clear and convincing evidence establishing facts which support the conclusion of invalidity. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 834 (Fed. Cir.1991). To be clear and convincing, the evidence must produce a firm belief or conviction that the matter sought to be established is highly probable and free from serious doubt. The validity of a patent may be upheld solely on the failure of the challenger's evidence to convincingly establish the contrary. *Orthokinetics*, 806 F.2d at 1570. If defendants present a prima facie case of invalidity, Maxwell, as the patentee, may have to come forward with rebuttal evidence. *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed.Cir. 1994). The presumption of validity, however, remains intact and the ultimate burden of proving invalidity remains with defendants. *Id.*

■ It is well established that an alleged "inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir.1993). Oral testimony by an alleged inventor asserting priority over a patentee's rights has traditionally been regarded with skepticism. *Id.* Accordingly, such testimony must be supported by some type of corroborating evidence before it can satisfy the clear and convincing standard.

■ While defendants admit that some type of corroboration is required, they suggest that corroboration of Warren Yeh's alleged prior conception is less important in this case. Defendants point out that virtually all of the cases that require corroboration are patent interference cases which directly implicate the temptation to perjure. While this may be true, the reason underlying the rule of corroboration is not so limited. Corroboration of prior conception by an alleged inventor is required because conception oc-

curs uniquely within the inventor's mind and the patentee cannot delve into the mental processes of the inventor. In addition, the rule recognizes that over time even the memories of honest witnesses falter and fade. Thus, corroboration of the time of the prior conception is necessary where the inventor attempts to remember when an invention was conceived. *Price,* 988 F.2d at 1195.

### A. Evidence Relating to Inventorship

Defendants have demonstrated, and Maxwell concedes, that the prototype Maxwell received from Regent Shoe in 1983 was produced in Taiwan by a shoe factory known as Stepping Ahead. Morse and Melville rely on the testimony of Warren Yeh, the general manager of Stepping Ahead when the factory started in July 1982, and others to invalidate the '060 patent. Defendants assert that the evidence overwhelmingly shows that Stepping Ahead, not Maxwell, was the original inventor of the shoe connection system claimed in the '060 patent.

Warren Yeh stated that in August 1982 Brian Reynolds of Kinney, Canada, asked Stepping Ahead to find a way to connect ladies' dress shoes which did not involve punching holes in the shoes. Warren Yeh claims that in response he and his factory manager, Mr. Liu, devised a shoe connection system identical to the one claimed in the '060 patent. Warren Yeh recalled that a connection system with tabs secured between the inner and outer soles was formulated within an hour. Warren Yeh said the first production run for Kinney began in October 1982 and was completed in November 1982. According to Warren Yeh, the first order of shoes shipped to Kinney in January 1983 used the tab connection system. Warren Yeh stated that Stepping Ahead first used a loop connection system in the spring or summer of 1983.

Brian Reynolds was a vice president of Kinney Canada in 1982. His responsibilities included buying shoes directly from foreign facilities without using importers or agents. Kinney was the first company to purchase shoes from Stepping Ahead. Reynolds said he placed the first order with Stepping Ahead either in the spring or fall of 1982.

Reynolds said the first shipment of shoes from Stepping Ahead did not use any connection system and Kinney used the awling system to join the shoes. After receiving the first shipment of shoes, Reynolds told Stepping Ahead that Kinney was interested in an alternative connection system which did not involve punching a hole through the side of the shoes.

Reynolds first saw a connection system similar to the one described in the '060 patent at Stepping Ahead when he returned to Taiwan. He was unsure of the exact date but said that it may have been in the fall of 1982. According to Reynolds, Kinney did not receive shoes attached with the tab connection system until the second or third order of shoes from Stepping Ahead. Reynolds does not know when the tab connection system was invented or who invented it. Another employee involved in importing shoes for Kinney Canada, Norman Creekpaum, said Stepping Ahead first showed him a tab connection system in March 1983.

The record includes a photograph of Warren Yeh, Brian Reynolds and his supervisor and others taken at Stepping Ahead that is dated January 6, 1983. Warren Yeh recalled that the photograph was taken during Reynolds' initial trip to the factory when Stepping Ahead shipped the first order of shoes for Kinney. According to Warren Yeh, Reynolds came to the factory in January 1983 before the shipment of the first order. Warren Yeh said Reynolds' visit was very significant for Stepping Ahead. Reynolds' passport, however, reveals that he was not in Taiwan on January 6, 1983. When asked about the photograph, Reynolds said the picture was taken when his supervisor was in Taiwan to inspect the factories supplying shoes to Kinney. Reynolds said his supervisor's visit occurred well after Stepping Ahead was shipping shoes to Kinney.

Regent Shoe had an exclusive affiliation with a vendor in Taipei known as Perfect 10. The related businesses were started in 1982. Regent Shoe imported shoes for retailers and Perfect 10 operated as a buying agent in Taiwan. Perfect 10 did not have the capacity to make sample shoes until late 1983 or early 1984. Prior to that time Perfect 10 had

samples made at various factories in Taiwan, including Stepping Ahead. Eddy Yeh was the president and managing director of Perfect 10. According to Warren Yeh, Eddy Yeh first learned of the shoe connection system during a factory tour of Stepping Ahead in late 1982.

Eddy Yeh stated that Perfect 10 first ordered women's shoes from Stepping Ahead in late 1982 or early 1983. Although Eddy Yeh could not recall when he first saw the patented shoe connection system, he stated that the system was being used by Taiwanese factories long before Regent Shoe and Perfect 10 were started in 1982. Eddy Yeh said he first saw the tab connection system in Taiwan factories but that it was not at Stepping Ahead. Eddy Yeh recalled that sometime in 1983 Perfect 10 received its first order from Target for shoes connected with the patented system. Eddy Yeh also said that Maxwell's prototype shoe appeared to be a production shoe rather than a specially made sample shoe.

Richard Shapiro of Regent Shoe testified that a shoe buyer at Target contacted him in 1983 and said Target was looking for a way to join shoes without punching holes in them. Shapiro, who has described himself as an intermediary between the United States and Taiwan, relayed Target's request to Perfect 10. Shapiro recalls that a factory in Taiwan experimented with placing the tab under the sock lining but found that it did not hold. According to Shapiro, a final decision to place the tab between the inner and outer soles of the shoe was made within a week or two.

In an affidavit submitted in support of Maxwell's patent application, Shapiro said a buyer at Target, possibly Maxwell, had the idea to place the tab between the soles of the shoe. Shapiro later said he did not know who suggested placing the tab between the inner and outer soles of the shoe but he credited the design to Eddy Yeh. Shapiro admitted that he does not know whether the information concerning placement of the tab came from Target or the factories in Taiwan.

Donald Hasek was Target's buyer for women's shoes in 1983 and worked closely with Maxwell during the period preceding the filing of her patent application. Target was interested in an alternative to the awling system and Hasek and Maxwell contacted vendors for suggestions. Hasek said Maxwell told him about the tab connection system after she talked with Regent Shoe. According to Hasek, Maxwell stated that Regent Shoe suggested placing the tab between the inner and outer soles of the shoe. Hasek acknowledged that Maxwell was the first person to tell him about the idea of using tabs to replace the awling system. Hasek recalled the system being compared to the "do not remove under penalty of law" tags on mattresses. While he has attributed the tab connection system to Regent Shoe, Hasek admits he does not know whether Maxwell provided Regent Shoe with the idea for the system.

## B. Derivation

■ In order to be entitled to a patent, section 102(f) of Title 35, United States Code, requires that Maxwell be the actual inventor of the subject matter patented. The presumption of the validity of a patent includes a presumption that the original inventor is named. Defendants dispute that the shoe connection system claimed in the '060 patent was invented by Maxwell. Morse and Melville assert that Maxwell learned of the tab connection system from Regent Shoe who, in turn, learned of the system from Stepping Ahead. Based on the evidence described above, defendants contend they have conclusively shown that the system claimed in the '060 patent was derived by Maxwell from Stepping Ahead's invention.

■ Derivation concerns the originality of the invention and focuses on who actually invented the invention claimed in the patent. To establish derivation defendants must prove by clear and convincing evidence: (1) prior conception of the claimed subject matter and (2) communication of the complete conception to Maxwell. *Price v. Symsek,* 988 F.2d 1187, 1190 (Fed.Cir.1993). Whether there was a prior conception is a question of law based on underlying factual determinations. *Id.* The question of whether a patentee derived an invention from another is one of fact. *Id.*

 All of the evidence of record must be collectively evaluated in determining whether defendants have established derivation. Corroboration of an alleged inventor's account of prior conception is necessary where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form with sufficient proof of identity in point of time. *Id.* at 1194. An alleged inventor may, however, "prove prior conception by clear and convincing evidence although no one piece of evidence in and of itself establishes the prior conception." *Id.* at 1196. It is sufficient if the evidence taken together creates a firm conviction that the alleged inventor's claim of prior conception is highly probable. *Id.*

### (1) Prior Conception

 Maxwell contends that defendants have failed to establish derivation because no evidence directly corroborates Warren Yeh's claim of prior inventorship. Warren Yeh claims that he and another Stepping Ahead employee devised the tab connection system in August 1982. Neither Reynolds, Eddy Yeh or Creekpaum know who invented the shoe connection system described in the '060 patent or when it was invented. Consequently, Warren Yeh's account of how the tab connection system was invented and the date of invention lack direct corroboration. Direct corroboration, however, is not essential to substantiate an alleged inventor's claim of prior conception; rather, what is required is some type of corroborating evidence which supports the inventor's claim of inventorship.

Defendants have offered sufficient evidence for a reasonable jury to find that a tab connection system within the scope of the '060 patent existed in Taiwan prior to the filing date of the patent. Reynolds, Eddy Yeh and Creekpaum all maintain they saw the embodiment of Warren Yeh's alleged invention at Stepping Ahead before Maxwell's patent application was filed. Their testimony, if believed, substantiates Warren Yeh's assertion that Stepping Ahead used a tab connection system to join shoes before Maxwell conceived of the idea or filed her patent application.

Maxwell argues that Warren Yeh's testimony should be rejected because his estimated date of conception is tied to his belief that a photograph of himself, Reynolds and others was taken at Stepping Ahead on January 6, 1983. Defendants respond that Warren Yeh's account of developing a tab connection system in 1982 does not depend on the photograph. Maxwell has shown that the photograph could not have been taken on January 6, 1983, as Reynolds was not then in Taiwan. Maxwell speculates that the photograph was taken the next year on January 6, 1984, when Reynolds was in Taiwan. It appears just as likely, however, that the day or month rather than the year was in error. While the discrepancy noted by Maxwell is not without significance, the court declines to categorically reject Warren Yeh's testimony based on the misdated photograph.

When competing claims of inventorship are at issue the time of conception becomes critical. Defendants insist that Maxwell's claim of inventorship is undermined by the discrepancy between the time of her actual conception and Susan Tigner's recollection as to when Maxwell shared her idea. The same can be said, however, of the evidence offered in support of Warren Yeh's claim of prior conception. For example, although Warren Yeh said the first order of shoes sent to Kinney in January 1983 used a tab connection system, Brian Reynolds stated that the tab connection system was not used until the second or third order of shoes from Stepping Ahead. A reasonable jury could consider this variance as well as other discrepancies in the evidence offered by defendants important in determining whether Warren Yeh conceived of the tab connection system before Maxwell did.

Defendants also claim that the prototype shoes corroborate Warren Yeh's claim of prior conception. Maxwell has never asserted that she reduced her invention to practice herself. It is also not disputed that the prototype, which embodies the tab connection system, was produced by Stepping Ahead. Defendants have not established when the prototype was actually produced by Stepping Ahead. Without that information the significance of the prototype is equivocal.

Although defendants assert the prototype embodies Warren Yeh's prior conception, a reasonable jury could find that the prototype was made in 1983 pursuant to Maxwell's directions as relayed through Regent Shoe.

After evaluating all of the pertinent evidence, the court concludes that defendants have not established facts that as a matter of law show the claimed invention was a prior conception of Warren Yeh. While defendants have offered evidence which tends to support Warren Yeh's claim of prior conception, the credibility of his account and the date of invention cannot be conclusively determined on this record. The evidence before the court is based solely on memories of long ago events and is not supported by any documents, contemporaneous or otherwise. While the testimony of Warren Yeh may prove to be credible and corroborated, a reasonable jury could reject the evidence as unreliable and insufficient to invalidate the '060 patent.

**(2) Communication**

■ Communication of the prior conception to the patentee cannot be presumed but must be established by clear and convincing evidence. Communication of a complete conception must be sufficient to enable one of ordinary skill in the art to construct and successfully operate the invention. "[M]ere proof of motive and opportunity (e.g. access) is not sufficient to carry the burden of proving derivation." *Hedgewick v. Akers*, 497 F.2d 905, 908 (C.C.P.A.1974).

■ Defendants contend that Maxwell learned of the tab connection system when she called Regent Shoe and Shapiro told her about the system. Defendants rely on the statements of Hasek and Shapiro as well as the prototype sent from Regent Shoe to Target to establish communication of the prior conception. Maxwell denies learning of the invention from Regent Shoe and argues the evidence fails to show that Warren Yeh's prior conception was communicated to her.

Hasek said Maxwell told him about the tab connection system after she talked with Regent Shoe. According to Hasek, Maxwell said Regent Shoe came up with the idea to place the tab between the inner and outer soles of the shoe. Defendants presume that Richard Shapiro at Regent Shoe communicated the conception to Maxwell. The evidence does not show, however, that Maxwell learned of the invention from Shapiro. Shapiro has never maintained that he told Maxwell about the tab connection system. Moreover, Shapiro admits he does not know whether the idea to place the tab between the soles of the shoe came from Taiwan or a buyer at Target.

Depending on the outcome of the competing claims of inventorship, communication of the prior conception to Maxwell before her date of invention may be shown by way of the prototype shoes. Maxwell concedes the prototype shoes were made by Stepping Ahead and that she received them from Regent Shoe prior to filing her patent application on October 6, 1983. A reasonable jury could find that the tab connection system was created by Stepping Ahead without any input from Maxwell and that she derived the invention claimed in the '060 patent from the prototype she received from Regent Shoe. If Maxwell's account of an earlier conception date is corroborated and believed, however, the derivation defense would fail, as absolutely no evidence suggests that any prior conception was communicated to Maxwell before the spring of 1983.

**C. Prior Invention of Another**

■ Although derivation and priority of invention are akin in that they both focus on inventorship and must be established by clear and convincing evidence, they are distinct concepts. *Price*, 988 F.2d at 1190. In contrast to a derivation claim, priority focuses on the first party to reduce an invention to practice. *Id.* Section 102(g) states a person shall be entitled to a patent unless "before the [patentee's] invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). Priority of invention goes to the first party to reduce an invention to practice unless the other party can show it was first to conceive of the invention and that it exercised reasonable

diligence in reducing the invention to practice. *Price,* 988 F.2d at 1190.

 Maxwell asserts that Morse's prior invention defense fails because the alleged prior invention was made in Taiwan not in the United States. It is well established that the introduction of a completed invention into the United States may be relied upon for priority purposes even though the invention was conceived and reduced to practice abroad. Thus, defendants may establish an earlier date of invention and actual reduction to practice by showing domestic introduction of the shoe connection system claimed in the '060 patent. *See Holmwood v. Sugavanam,* 948 F.2d 1236 (Fed.Cir.1991) (although invention was made in Germany, prior invention in this country was shown through evidence that inventor's assignee sent a sample to its research unit in United States to verify positive test results).

 It is undisputed that the first embodiment of the tab connection system in the United States was the prototype shoes Target received from Regent Shoe in July 1983. It is also uncontroverted that the prototype shoes were made by Stepping Ahead in Taiwan and existed in this country before Maxwell's patent application was filed. Maxwell asserts that the prototype shoes were produced at her direction as relayed through Regent Shoe. Defendants have offered evidence, however, which tends to refute Maxwell's claim that the prototype is attributable to her. The evidence would also support a finding of an earlier date of invention and reduction to practice based on the introduction of the invention into the United States. The court concludes that a reasonable jury could find that the prototype shoes are a prior invention invalidating the '060 patent and, therefore, Maxwell is not entitled to summary judgment on Morse's prior invention defense under 35 U.S.C. § 102(g).

**D. Failure to Name Joint Inventors**

 Morse also contends that the '060 patent is invalid because Maxwell failed to name others who contributed to the shoe connection system claimed in patent. Under sections 102 and 116 of Title 35, United States Code, co-inventors must file a joint application and must be named in the patent.[2] The presumption of the validity of a patent includes a presumption that the correct inventor is named. Maxwell is the only inventor named in the patent. To invalidate Maxwell's patent based on the failure to name joint inventors, Morse must show by clear and convincing evidence that Maxwell was not the only inventor and that others collaborated with Maxwell to produce the claimed invention.

 A joint invention is the product of collaboration of the inventive endeavors of two or more persons working toward the same end and producing an invention by their aggregate efforts. *Kimberly–Clark Corp. v. Proctor & Gamble Distrib. Co.,* 973 F.2d 911, 916 (Fed.Cir.1992). To be a joint inventor, one must make some original contribution to the inventive thought and the final solution of the problem. *Id.* One does not become a joint inventor, however, merely by assisting the actual inventor after the inventive concept is conceived.

 Morse claims that someone other than Maxwell came up with the concept of securing the tab between the inner and outer soles of the shoe. Without identifying the prospective co-inventor, Morse asserts that Maxwell should have named as an inventor the person responsible for that feature. Morse relies on the testimony of Hasek, Shapiro and Warren Yeh to support its joint inventors defense. According to Hasek, Maxwell said Regent Shoe came up with the idea to place the tab between the inner and outer soles of the shoe. Although Shapiro credits the design to Eddy Yeh, he does not know who suggested placing the tab between

**2.** 35 U.S.C. § 116 provides:
When an invention is made by two or more persons jointly, they shall apply for patent jointly and each sign the application and make the required oath, except as otherwise provided in this title.

If the failure to name a joint inventor occurred through error, the court may order correction of the patent on notice and hearing of all parties concerned as long as such error arose without deceptive intention. 35 U.S.C. § 256.

the inner and outer soles of the shoe or whether the idea came from Target or the factories in Taiwan.

While there is evidence which suggests that Maxwell was not the original inventor of the claimed invention, the evidence does not suggest the invention was a collaboration between co-inventors. There is no evidence that Hasek made any original contribution to the invention. Neither Shapiro or Eddy Yeh contend that they contributed to the inventive process. The only evidence concerning another inventor suggests that Warren Yeh was the true inventor of the tab connection system and he denies that Maxwell had any input in the inventive process. Maxwell also denies the input of others in the inventive concept. On this record the invention claimed in the '060 patent cannot be considered a joint one. The evidence does not show that Maxwell collaborated with others to produce the claimed invention and, accordingly, Morse has failed to established the '060 patent may be invalid for failure to name joint inventors.

### E. Section 112

 A patent specification must contain an accurate written description of the invention so as to enable any person skilled in the art to make and use the invention. 35 U.S.C. § 112. The patent must set also forth claims which distinctly claim the patentee's invention. *Id.* The description requirement is designed to protect valid inventions and provide reasonable certainty as to the scope of the patent grant. The presumption of the validity of a patent includes a presumption that the invention is correctly and adequately described in the claims and specification.

 Melville contends that the '060 patent is invalid under 35 U.S.C. § 112 for failure to accurately describe and distinctly claim the subject matter which Maxwell regarded as her invention. Melville asserts the language in claims 1 and 3 that "on removal of said fastening element, said shoes separate and said tabs are not visible outside said shoe uppers" are false statements. Melville offers the opinion of Harold Stotland, a patent lawyer with 27 years of experience. Stotland asserts the quoted language is false because

after removal of the filament the tabs remain plainly visible outside the shoe uppers. Maxwell responds that the proper interpretation of the claim language is that the tabs are not visible when the shoes are worn. Maxwell maintains that her interpretation is consistent with the description and purpose of the invention set forth in the specification.

Melville has failed to demonstrate by clear and convincing evidence that the patent claims contain false language or fail to accurately describe the invention. Claims 1 and 3 describe tabs that extend upward along the inside of the shoe upper and remain beneath the top edge of the upper. The claims also state that on removal of the fastening element the tabs are not visible outside the shoe uppers. Upon removal of the fastening element the tabs, as described, do not extend above the shoe upper and are not visible outside the shoes when they are worn. The court also notes that the patent drawings accurately depict the tabs described in the claim language.

 Melville also contends that the claim language concerning the visibility of the tabs lacks antecedent basis in the description. The function of the specification is to detail how the claimed invention is to be practiced by one skilled in the art. Every feature recited in a patent claim need not be described in the specification as long as the essential features which are necessary to the desired result are described. The description of Maxwell's invention in the specification is adequate to allow one skilled in the art to practice the shoe connection system claimed in the '060 patent. The court concludes the '060 patent meets the statutory standards set forth in 35 U.S.C. § 112 and that Melville has failed to establish the invalidity of the patent under that provision.

### 2. Compliance with the Marking Statute

 Damages for infringement run from the time a patentee began marking the patented article in compliance with 35 U.S.C. § 287(a) or when she actually notified defendants of their infringement, whichever is earlier. *American Medical Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed.Cir.

1993) ("*AMS*"). Section 287(a) provides in relevant part:

> Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent.

35 U.S.C. § 287(a). A patentee may give constructive notice of her patent by marking the patent number on substantially all patented articles sold under her authority. Substantially all means that all but a few of the patented articles sold by the patentee or her licensee were marked with the patent number. If there is a delay between issuance of the patent and compliance with the marking statute, as there was here, the marking once begun "must be substantially consistent and continuous in order for the [patentee] to avail itself of the constructive notice provisions of the statute." *AMS*, 6 F.3d at 1537.

Maxwell has the burden of proving when she and Target as her licensee fully complied with the marking statute. An implied de minimis exception protects the patentee whose compliance with the marking statute is nearly perfect. *Hazeltine Corp. v. Radio Corp. of America*, 20 F.Supp. 668 (S.D.N.Y.1937). Maxwell asserts that since 1987 Target has maintained substantial and continuous marking of the patented articles. Defendants contend that over the years more than a de minimis number of shoes were sold by Target without the requisite marking and, therefore, that Maxwell's damages should be limited to the period after they had actual notice of the infringement.

Maxwell argues that as a licensor she complied with the marking statute by taking "reasonable efforts" to ensure that Target properly marked shoes using the patented system. Defendants respond that the requirements of the marking statute cannot be discharged by reasonable efforts on the part of Maxwell. While Maxwell's efforts to en-sure proper marking are relevant, the court agrees with the interpretation of the marking statute advanced by defendants. The purpose of the constructive notice provision of section 287 is "to give patentees the proper incentive to mark their products and thus place the world on notice of the existence of the patent." *AMS*, 6 F.3d at 1538 (quotation omitted). To provide notice to the public substantially all patented articles made or sold by the patentee or under her authority must be properly marked.

In *Amsted Industries, Inc. v. Buckeye Steel Castings Co.*, the Federal Circuit stated that "[a] licensee who makes or sells a patented article does so 'for or under' the patentee, thereby limiting the patentee's damage recovery when the patented article is not marked." 24 F.3d 178, 185 (Fed.Cir. 1994). The Federal Circuit has also held that the date a patentee "began marking its products is irrelevant for purposes of the statute, because marking alone without distribution provides no notice to the public where unmarked products are continuing to be shipped." *AMS*, 6 F.3d at 1537–38. Compliance with the marking statute cannot be measured by the reasonable efforts of a licensor alone as such efforts without substantial and continuous marking by the licensee provide no notice to the public. The world cannot be "put on notice" if, despite the licensor's best efforts to ensure proper marking, the licensee continues to distribute unmarked articles.[3]

Defendants assert summary judgment is proper because Target never fully complied with the requirements of the marking statute. Defendants proffer evidence which suggests that the marking statute was not fully complied with because Target sold a substantial number of shoes without the necessary marking. Thus, a reasonable jury could find that marking was haphazard and the statute was never fully complied with at

---

3. When this issue was first posed on similar facts in *Maxwell v. J. Baker, Inc.*, the court held there was a genuine issue of fact "concerning the reasonableness of Maxwell's efforts to police Target's marking." 805 F.Supp. 728, 733 (D.Minn. 1992). The decision in *AMS* was issued just before the *J. Baker* case went to trial. Maxwell sought a jury instruction stating that a patentee-licensor's compliance with § 287 turns on the reasonableness of her efforts to ensure that the licensee marked the patented articles. The court denied the instruction holding that it did not properly state the law in light of *AMS*. Trial transcript pp. 2997–3000.

any time prior to actual notice. There is also evidence that indicates the requirements of the marking statute were met by Maxwell and Target during 1987. Accordingly, the court holds that whether and when Maxwell complied with the marking statute presents a genuine issue of material fact to be resolved by the jury.

■ Morse concedes that fact issues exist concerning the extent of marking by Target and the reasonableness of Maxwell's efforts to ensure marking. However, Morse insists that Target's failure to mark boots and shoes purchased from dealer stock precludes Maxwell from invoking the constructive notice provision of section 287(a).[4] There is evidence that Target purchased dealer stock shoes from vendors who had been repeatedly instructed to mark the loops on such shoes with the patent number. Morse contends that not until March 1990 were vendors instructed to mark boots with the patent number rather than "patent pending." There is evidence, however, that in 1987 vendors were notified by Target and Maxwell to change the marking on boots from patent pending to the patent number.

Maxwell appears to concede that the failure of vendors to follow ticketing instructions resulted in occasional shipments of unmarked shoes to Target. Maxwell alleges that various vendors, including Elan–Polo, ESO and Pagoda, intentionally violated Target's ticketing instructions and conspired with defendants to sell infringing shoes. Maxwell asserts that such vendors do not act "for or under" her and that defendants cannot limit their damages for infringement based on renegade acts of their own vendors who assist in their infringement. The failure to mark by third parties not contractually bound to Maxwell is, of course, not chargeable to her; however, the acts of Target as her licensee are. Once unmarked footwear was delivered, Target had the obligation and the opportunity to prevent such footwear from reaching the public. Target used the patented fasteners "for or under" Maxwell and its sale of unmarked articles is attributable to her.

**3. Actual Notice of Infringement**

■ Section 287(a) provides that absent marking, a patentee may recover damages only on proof that the "infringer was notified of the infringement and continued to infringe." 35 U.S.C. § 287(a). Notice must be an affirmative act on the part of the patentee which informs the infringer of its infringement of the patent. *Amsted,* 24 F.3d at 187; *Dunlap v. Schofield,* 152 U.S. 244, 248, 14 S.Ct. 576, 577, 38 L.Ed. 426 (1894). Maxwell has the burden of proving when defendants had actual notice of their infringement. Maxwell may not demonstrate actual notice merely by showing that defendants were aware of the '060 patent. Rather, for purposes of section 287(a):

> [N]otice must be of "the infringement," not merely notice of the patent's existence or ownership. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device.

*Amsted,* 24 F.3d at 187. Thus, the statutory notice requirement is satisfied when Maxwell provided specific and direct notification to defendants of their infringement of the '060 patent.

**A. Communications between Maxwell and Defendants**

In April 1990 a copy of the '060 patent along with a letter was sent by Maxwell to nearly 200 discount retailers, including defendants. The letter inquired whether the retailer used or contemplated using the shoe connection system claimed in the patent. The letter invited discussions concerning licensing and stated that the patented system was available for purchase from Magna Inc. Maxwell also enclosed a copy of a letter from her legal counsel that referred to Maxwell as the patentee and owner of the '060 patent.

Maxwell telephoned Melville for its response to the April 1990 letter. Melville stated that most of its divisions did not use the shoe connection system described in the patent. Melville also said it had not yet

---

4. The bulk of shoes sold by Target are ordered prior to manufacture and imported, usually from the Orient. Target also sells shoes purchased out of dealer stock. Dealer stock consists of footwear imported by vendors or other third parties for potential sale to Target and other retailers.

heard back from one of its divisions. On May 15, 1990, Maxwell sent Melville a letter expressing her concern with the loop tie system depicted in the ticketing and tagging instructions used by its Meldisco division and repeated that the patented system was available for purchase. Ten days later Maxwell sent Melville another letter stating that her concern had risen to a very high level. Maxwell indicated that a footwear agent told her that Meldisco required the use of a loop fastening system on all imported shoes. Melville responded that it would discuss these issues with its Meldisco division. On June 14, 1990, Melville told Maxwell it had referred the matter to outside patent counsel and would contact her when it received a legal opinion.

On July 12, 1990, Maxwell sent Melville a price quote for domestic production and distribution of the patented system. On July 24, 1990, Maxwell notified Melville that she had found shoes attached with the patented system and marked with the patent number and her SOX–TAB trademark in a K mart store. Maxwell identified the stock number and brand name of the infringing shoes. The letter said that "[f]ormal notification about the SOX–TAB patent and trademark was given to Melville, Meldisco, and K mart in April 1990." Maxwell also stated that if efforts to reach a resolution failed she would refer the matter to her attorney.

On June 24, 1991, Maxwell's counsel sent a letter to Melville stating that Maxwell had previously notified Melville that it was infringing her patent by selling shoes using attachment systems covered by the '060 patent. The letter also stated that Maxwell was committed to enforcing her patent rights. The letter indicated that a lawsuit against Melville was not imminent given the demands of the litigation with J. Baker.[5] It was underscored, however, that Melville's sales of infringing shoes were a concern and might give rise to future legal action.

On May 9, 1990, Maxwell sent Morse a letter identical to the one sent to other retail-

ers on April 20, 1990.[6] In response to the letter, Morse consulted outside counsel and explained that "the owner of the patent claims that the only non-infringing method of using this patent is marketed under the trademark SOX–TAB." Morse sought advice concerning the validity of the patent and a proposed response. On June 6, 1990, counsel responded that the connection systems used by Morse appeared to infringe the '060 patent and that, upon request, it would explore the validity of the patent as well as alternative connection methods. Morse told Maxwell that based on the opinion of outside counsel it was interested in a settlement.

On July 16, 1990, Maxwell proposed a price of $.07 per pair of shoes and, in September, sent Morse a letter and proposed licensing agreement between Morse and Magna, Inc. The letter referred to an escalated royalty for "past usage." A release provision was included in paragraph 9 of the licensing agreement. Maxwell also provided Morse with a closing agreement which, if executed with the licensing agreement, would release Morse from claims of patent infringement, including willful infringement. On October 2, 1990, Morse was advised by counsel that infringement of the patent could be avoided by adopting modified shoe connection systems. Morse rejected the licensing agreement and no further negotiations occurred.

On June 24, 1991, Maxwell's counsel sent Morse a letter identical to the one sent to Melville on that same date. The letter stated:

> We represent Susan M. Maxwell in her efforts to enforce her U.S. Patent No. 4,624,060, covering a SYSTEM FOR ATTACHING MATED PAIRS OF SHOES TOGETHER, a copy of which is attached.
>
> Ms. Maxwell has previously notified you of her patent and that shoes sold in your stores with loops attached inside through which filaments are used to join pairs infringe her patent. Ms. Maxwell has also offered a license to practice her patent.

---

5. Maxwell filed suit against J. Baker, Inc. in December 1990.

6. Maxwell attempted to send a letter to Morse on April 20, 1990, but it was incorrectly addressed. After discovering the mistake, Maxwell resent the letter on May 9, 1990.

We are writing to confirm Ms. Maxwell's commitment to enforce her patent rights. Her patent gives the exclusive right to make, use and sell shoes joined together with her system in the United States.

We have already filed a patent infringement action against J. Baker, Inc. This lawsuit, Civil Action No. 4–90–941, is now pending in the U.S. District Court in Minnesota.

Because of our involvement in the case against J. Baker, we do not intend to bring suit against your company in the near future. However, we assure you that your sales of infringing shoes remain a concern and may give rise to a legal action after the termination of the J. Baker litigation.

## B. Satisfaction of the Statutory Standard for Actual Notice

■ Defendants claim that Maxwell's April 1990 letter was merely informational, that is it informed the retail shoe industry of the existence of the '060 patent and the availability of a license. The court agrees that the April 1990 letter does not meet the statutory standard for actual notice under section 287(a). The letter did not directly charge any retailer with infringement of the '060 patent. Rather, the letter served to notify the industry of the '060 patent and generally advised retailers not to infringe. *Accord Amsted*, 24 F.3d at 187.

■ Defendants also contend that the June 24, 1991, letter failed to provide proper notice because it did not contain a statement that shoes sold by defendants infringe the '060 patent. The court disagrees. The letter explicitly charged that "shoes sold in [defendants'] stores with loops attached inside through which filaments are used to join pairs infringe [the '060] patent." The letter also stated that defendants' "sales of infringing shoes" were a concern and might give rise to future legal action. The court concludes that the June 24, 1991, letter provided actual notice within the meaning of section 287(a) as it specifically charged that defendants infringed the '060 patent with a specific accused device. Thus, at the latest, defendants had actual notice of their infringement by June 27, 1991.

■ "The correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or the understanding of the infringer." *Amsted*, 24 F.3d at 187 (citing *AMS*, 6 F.3d at 1537 n. 18.) Advocating a totality of the circumstances approach, Maxwell claims that factual issues exist concerning whether she gave defendants actual notice of their infringement during 1990. With respect to Melville, Maxwell contends that the composition of her letters and telephone calls in 1990 directly charged Melville with infringement of the '060 patent and identified infringing devices. Melville responds that even when taken collectively Maxwell's communications during 1990 do not constitute a specific charge of infringement. Taking the evidence in the light most favorable to Maxwell, the court concludes that a reasonable jury could find that Maxwell provided actual notice of infringement to Melville sometime before June 27, 1991.

The question of whether section 287 is satisfied where the infringer acknowledges a specific communication from the patentee to be a notice of infringement has been left open by the Federal Circuit. *Amsted*, 24 F.3d at 187 n. 5. There is evidence that Maxwell's communications in May 1990 were acknowledged by Morse to be notice of infringement. In response to her communications, Morse told Maxwell that based on the opinion of outside counsel it was interested in a settlement. On September 4, 1990, Maxwell proposed a licensing agreement which would have released Morse from claims of patent infringement. The court concludes that whether the actual notice component of section 287 was satisfied with respect to Morse in 1990 presents a genuine issue of material fact to be resolved by the jury.

## 4. Morse's Bankruptcy Defense

■ On January 24, 1991, Morse filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Maxwell was not listed on the schedule of creditors which accompanied Morse's chapter 11 petition. On June 24, 1991, the bankruptcy court entered an order setting September 30, 1991,

as the bar date for filing proofs of claim against Morse. Morse published notice of the bar date in local and national papers and in *Footwear News*, a national shoe industry trade journal. However, Maxwell was not served with notices, the proposed plan of reorganization or any orders. Maxwell did not file a notice of appearance or a proof of claim. An order confirming Morse's reorganization plan under chapter 11 was entered on December 20, 1991. One year after the plan was confirmed, Maxwell received formal notice when Morse answered her complaint in this case on December 17, 1992.

Morse asserts that Maxwell's claim for patent infringement was discharged pursuant to 11 U.S.C. § 1141, as a result of the bar date order entered by the bankruptcy court on June 24, 1991. Morse also contends that Maxwell's infringement claim is barred by the confirmation order dated December 20, 1991. Maxwell responds that her action against Morse is not barred because Morse knew of her patent infringement claim before entry of both orders yet failed to give her formal notice of the bankruptcy proceeding.

Before their claims may be barred under the Bankruptcy Code, all creditors must receive reasonable notice of the time set for filing proofs of claims. The type of notice required depends upon whether a creditor is known or unknown. A creditor is known if the debtor knows or has reason to know of the creditor's claim. *In re Allegheny Int'l, Inc.*, 158 B.R. 356, 358 (Bankr. W.D.Pa.1993). A known creditor's claim cannot be discharged in bankruptcy unless the creditor received actual notice of the bankruptcy proceedings. Where a debtor is unaware and has no reason to be aware of a creditor's claim, however, the creditor is unknown and notice by publication generally suffices. *In re Thomson McKinnon Securities, Inc.*, 130 B.R. 717, 719–20 (Bankr. S.D.N.Y.1991). "Unknown creditors are those whose identities or claims are not reasonably ascertainable and those creditors who hold only conceivable, conjectural or speculative claims." *Id.* at 720 (citation omitted).

The standard for determining a known creditor is an objective one measured by reasonable foreseeability. A party is a known creditor if it is reasonably foreseeable to a debtor that the party has a potential claim. *In re Allegheny*, 158 B.R. at 358. Although a debtor is not required to search out each conceivable creditor, a debtor must make reasonably diligent efforts to uncover the identities of those who have claims against the debtor. *In re Thomson McKinnon*, 130 B.R. at 720. The duty of a debtor to provide actual notice is not excused by the failure to discover a creditor if such failure is inconsistent with reasonable diligence.

The question here is whether Morse could have reasonably foreseen that Maxwell would seek to impose legal liability because of the shoe connection systems it used. Morse breaks down its bankruptcy defense into two components. First, Morse argues that it had no reason to know of Maxwell's claim of infringement prior to the June 24, 1991, order which fixed the bar date. Second, although Morse concedes that it may have had notice of a potential patent infringement claim before the confirmation order was entered, it asserts that at most it was aware of a claim by Magna, Inc. and not by Maxwell individually. The court rejects both contentions and concludes that Morse could have reasonably foreseen that it would face the infringement claim asserted by Maxwell in this case.

The exchange of written and oral correspondence between Maxwell and Morse during 1990 is described in detail above. For the most part the correspondence from Maxwell was written on Magna, Inc. letterhead. Maxwell also sent Morse a copy of the '060 patent which listed her as the owner and did not include any assignments. On June 27, 1991, Morse received a letter from Maxwell's counsel stating Maxwell had previously notified Morse that it was infringing her patent by selling shoes using attachment systems covered by the '060 patent. The letter also stated that Maxwell was committed to enforcing her patent rights and that, although a lawsuit against Morse was not imminent given the demands of litigation against another infringer, Morse's infringing sales might be the subject of a lawsuit in the future.

Morse insists that it had no reason to believe that Maxwell would try to impose liability based on the shoe connection systems it used. Morse concedes that prior to filing for bankruptcy it knew of the '060 patent and a potential claim of infringement by Magna, Inc. However, Morse maintains it was unaware the patent was owned by Maxwell. A debtor, however, must make reasonably diligent efforts to uncover the identities of those who have claims against it. Even if prior to receiving the letter from Maxwell's counsel Morse believed that Magna, Inc. rather than Maxwell had a potential infringement claim against it—a position the court doubts—Morse failed to take any efforts to ascertain the true identity of the claim holder.[7] Morse had a copy of the '060 patent which listed Maxwell as the owner. Had Morse exercised reasonable diligence, as it was obligated to do, it would have learned that Maxwell individually had a claim against it for infringement of the '060 patent.

If there was any room for doubt as to the identity of the claim holder, the letter from Maxwell's counsel made clear that Maxwell owned the '060 patent as well as any claim of infringement against Morse. Morse received the letter on June 27, 1991; five days later on July 1, 1991, Morse sent notice of the bar date to other known creditors. Thus, even assuming that Morse had no reason to know of Maxwell's claim prior to June 27, 1991, when the existence of Maxwell's claim became known to Morse during the pendency of the bankruptcy proceedings it was incumbent on Morse to see that proper notice was given to Maxwell.

The court concludes that by June 27, 1991, Morse knew or should have known of its potential liability to Maxwell for infringement of the '060 patent. Morse insists that material issues of fact exist concerning whether it actually knew of Maxwell's claim of infringement prior to the confirmation order. That argument, however, ignores the objective standard the court applies. The issue is not whether Morse actually knew of Maxwell's claim but whether it should have

known of the claim it now seeks to bar. The evidence when subjected to a standard of reasonableness simply leaves no room for difference of opinion. The court determines that Maxwell was a known creditor entitled to actual notice.

Morse implies that because Maxwell was in the footwear industry and saw articles concerning Morse's bankruptcy she should have filed a claim prior to the bar date. The United States Supreme Court long ago rejected the argument that creditors who have knowledge of a reorganization have a duty to inquire for themselves about possible court orders limiting the time for filing claims. *City of New York v. New York, N.H. & H.R. Co.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). The Court held that "even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred." *Id.* at 297, 73 S.Ct. at 301. Thus, "even if [Maxwell] had actual notice of the bankruptcy proceedings, that fact would not have obviated the necessity for the service of formal notice on [Maxwell], nor would it have validated the discharge of [Maxwell's] claim as a result of the order entered by the bankruptcy court." *Broomall Indus., Inc. v. Data Design Logic Sys., Inc.,* 786 F.2d 401, 405 (Fed.Cir.1986).

The court also notes that Fifth Amendment due process considerations are implicated where, as here, the debtor knows or has reason to know of claims and fails to inform claimants of the pendency of the bankruptcy proceedings. *Id.* at 403. The discharge of a claim without reasonable notice violates the Fifth Amendment. Maxwell, as a known creditor, was entitled to actual notice of the bankruptcy proceedings. Because Maxwell as a known creditor did not receive the notice to which she was due, the orders relied on by Morse and the plan confirmed by the bankruptcy court have no legal effect on Maxwell's claim against Morse for infringement of the '060 patent and the claim was not discharged pursuant to section 1141 of the Bankruptcy Code. *See Reliable Elec.*

---

7. The court notes that Morse did not list Magna, Inc. on the schedule of creditors or give Magna,

Inc. any notice of the bankruptcy proceedings.

*Co., Inc. v. Olson Const. Co.*, 726 F.2d 620 (10th Cir.1984). Accordingly, the court grants summary judgment in favor of Maxwell on the bankruptcy bar defense asserted by Morse.

### 5. Morse's Infringing Sales

■ Maxwell seeks summary judgment in her favor holding that at least 30% of Morse's shoe sales after November 25, 1986, involved infringing products unless Morse provides documentation of shoes sold with a loop system since 1986. Maxwell's novel request is based on what she fears are discovery violations on the part of Morse. Maxwell has made repeated requests for Morse to produce sales figures for shoes attached with a loop system. Morse has produced its total volume of shoe sales and an employee who gave varying estimates concerning the percentage of shoes joined with a loop system in relation to Morse's overall sales. The Morse employee acknowledged that his estimates were not based on any specific efforts to make accurate calculations of infringing sales. Morse has not provided Maxwell with any calculations or sales figures and claims that such information does not exist.

Maxwell points out that J. Baker, a company owned by Morse, took a similar stance in its litigation until just before trial. During discovery J. Baker produced its overall sales figures but claimed that more specific information concerning shoes attached with a loop system did not exist. On the eve of trial, J. Baker suddenly produced sales figures for shoes attached with a loop system along with boxes of supporting documents and identified several witnesses who would testify about the figures at trial. J. Baker's calculations of its infringing sales were much lower than Maxwell's estimates derived from the total sales figures originally produced by J. Baker. J. Baker's late production forced Maxwell to review voluminous documents and take depositions during trial when she was presenting her case. Maxwell believes, and justifiably so, that she was sandbagged by J. Baker. She seeks today to prevent a similar occurrence at the hands of Morse in this case.

Although the court sympathizes with Maxwell's position and unfortunately has no as-surance that her concerns are misplaced, it considers the relief she seeks premature. Other than suspicion based on past treatment by a company related to Morse and represented by the same counsel, Maxwell has no evidence that any discovery violation by Morse has taken place or will occur in the future. The court realizes that Morse's apparent failure to keep accurate records places a burden on Maxwell. While Morse was not expected to maintain separate records before it had notice of infringement, after Maxwell charged it with infringement of the '060 patent Morse should have established separate records to track sales of potentially infringing shoes. Morse's failure to maintain such records, however, will be charged against it and not Maxwell.

It is appropriate for the court to advise Morse that the last minute production of previously withheld discovery or newly created information pertaining to infringing sales figures will not be tolerated and will be met with harsh sanctions. The court is hopeful that such an admonition is unnecessary. However, should the tactics feared by Maxwell become a reality Morse should know that they will not be countenanced by the court.

### CONCLUSION

Defendants sought summary judgment asserting that the '060 patent is invalid under 35 U.S.C. §§ 102(f) and (g) and 112 and that Maxwell failed to satisfy the notice and marking provisions of 35 U.S.C. § 287. While there are facts that suggest Maxwell was not the first or the original inventor of the shoe connection system claimed in the patent, the court holds that the evidence fails to establish the '060 patent is invalid as a matter of law. Having found that there are facts which support the defenses raised under section 102(f) and (g), the court holds that Maxwell is not entitled to summary judgment on the validity of the '060 patent. Summary judgment in favor of Maxwell is warranted on subsections (a) through (e) of section 102 as well as on Melville's invalidity defense asserted under 35 U.S.C. § 112. Maxwell is also entitled to summary judgment on Morse's bankruptcy bar defense be-

cause she was a known creditor and Morse failed to give her actual notice of the bankruptcy proceedings.

Whether and when Maxwell complied with the marking statute presents genuine issues of material fact which must be resolved by a jury. With respect to actual notice, Maxwell's April 1990 letter does not satisfy the statutory standard under 35 U.S.C. § 287(a). The court concludes, however, that at the latest defendants had actual notice of their infringement by June 27, 1991, when they received the letter from Maxwell's counsel. Whether Maxwell satisfied the actual notice requirement of section 287(a) sometime before June 27, 1991, also presents a genuine issue of material fact for the jury.

Based on the foregoing, **IT IS HEREBY ORDERED** that the motions of defendant Melville Corporation for summary judgment and partial summary judgment are denied; the motion of defendant Morse Shoe, Inc. for partial summary judgment is denied; and the motion of plaintiff Susan M. Maxwell for partial summary judgment is granted in part and denied in part.